# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| BRENDA VANCE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **Cause No. 1:13-cv-1836-WTL-MJD** |
| | ) | |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner of the Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |

## ENTRY ON JUDICIAL REVIEW

Plaintiff Brenda Vance requests judicial review of the final decision of Defendant Carolyn W. Colvin, Acting Commissioner of the Social Security Administration ("Commissioner"), denying her application for Disability Insurance Benefits ("DIB"). The Court rules as follows.

## I. PROCEDURAL HISTORY

Vance filed her application for DIB on January 5, 2011, alleging onset of disability on July 14, 2010. Her application was denied initially and upon reconsideration, whereupon she requested and was granted a hearing before an administrative law judge ("ALJ"). On July 5, 2012, Vance and her non-attorney representative appeared before an ALJ for a hearing, at which a medical expert and a vocational expert also testified. In a decision dated August 20, 2012, the ALJ determined that Vance was not disabled under the terms of the Social Security Act ("the Act"). The Appeals Council denied Vance's request for review of the ALJ's decision, and Vance filed this timely action for judicial review.

## II. <u>APPLICABLE STANDARD</u>

Disability is defined as "the inability to engage in any substantial gainful activity by reason of a medically determinable mental or physical impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of at least twelve months." 42 U.S.C. ' 423(d)(1)(A). In order to be found disabled, a claimant must demonstrate that her physical or mental limitations prevent her from doing not only her previous work, but any other kind of gainful employment that exists in the national economy, considering her age, education, and work experience. 42 U.S.C. ' 423(d)(2)(A).

In determining whether a claimant is disabled, the Commissioner employs a five-step sequential analysis. At step one, if the claimant is engaged in substantial gainful activity she is not disabled, despite her medical condition and other factors. 20 C.F.R. ' 404.1520(b). At step two, if the claimant does not have a "severe" impairment (i.e., one that significantly limits her ability to perform basic work activities), she is not disabled. 20 C.F.R. ' 404.1520(c). At step three, the Commissioner determines whether the claimant's impairment or combination of impairments meets or medically equals any impairment that appears in the Listing of Impairments, 20 C.F.R. pt. 404, subpt. P, App. 1, and whether the impairment meets the twelve-month duration requirement; if so, the claimant is deemed disabled. 20 C.F.R. ' 404.1520(d). At step four, if the claimant is able to perform her past relevant work, she is not disabled. 20 C.F.R. ' 404.1520(f). At step five, if the claimant can perform any other work in the national economy, she is not disabled. 20 C.F.R. ' 404.1520(g).

In reviewing the ALJ's decision, the ALJ's findings of fact are conclusive and must be upheld by this court "so long as substantial evidence supports them and no error of law occurred." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). "Substantial evidence

means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *id.*, and this court may not reweigh the evidence or substitute its judgment for that of the ALJ. *Overman v. Astrue*, 546 F.3d 456, 462 (7th Cir. 2008). The ALJ is required to articulate only a minimal, but legitimate, justification for her acceptance or rejection of specific evidence of disability. *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004). In order to be affirmed, the ALJ must articulate her analysis of the evidence in her decision; while she "is not required to address every piece of evidence or testimony," she must "provide some glimpse into her reasoning . . . [and] build an accurate and logical bridge from the evidence to her conclusion." *Id.*

## III. <u>THE ALJ'S DECISION</u>

The ALJ found at step one that Vance had not engaged in substantial gainful activity since the alleged onset date of July 14, 2010. At steps two and three, the ALJ concluded that Vance had the severe impairments of status-post bilateral carpal tunnel release and right ulnar nerve transposition, but that those impairments, singly or in combination, did not meet or medically equal a listed impairment. At step four, the ALJ concluded that Vance

> has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except: She can never climb ladders, ropes or scaffolds. She can occasionally climb ramps and stairs, kneel, stoop, crouch, and crawl; and frequently balance. She can frequently finger and grasp bilaterally, but cannot perform repetitive wrist flexion bilaterally. She must avoid concentrated exposure to extreme cold; avoid moderate exposure to vibrations; and have no close proximity to dangerous moving machinery, unprotected heights, and commercial vehicles.

Record at 17. Given this residual functional capacity ("RFC"), the ALJ concluded that Vance was able to perform her past relevant work as a fixture maker and a manager at a retail store. Alternatively, the ALJ found at step five that she was able to perform other jobs in the national

economy, including check room attendant, ticket taker, and sorter. Therefore, the ALJ determined that Vance was not disabled as defined by the Act.

## IV. DISCUSSION

The facts of record, including the details of Vance's medical treatment, are set forth quite thoroughly in Vance's brief and need not be repeated here. Facts directly relevant to the Court's analysis are discussed in context below.

Vance argues that the ALJ's decision is flawed in several respects. Each of the issues she raises is discussed, in turn, below.

*The ALJ's Treatment of Vance's Reflex Sympathetic Dystrophy Diagnosis*

Vance argues that the ALJ failed properly to consider the evidence of record relevant to whether Vance suffers from reflex sympathetic dystrophy ("RSD"). The Court agrees.

Vance underwent left ulnar nerve decompression and carpal tunnel release surgery on July 15, 2010. She underwent the same surgery on her right arm a month later. Vance experienced improvement on the left side, but did not obtain adequate relief of her symptoms on the right. On November 18, 2010, she underwent a right ulnar nerve transposition surgery.

Beginning in March 2011, Vance complained of increased skin sensitivity in her right arm, reporting to her orthopedic surgeon, Dr. Louis Metzman, that bed sheets, clothing, and even wind caused pain. On physical exam, Dr. Metzman noted that "[t]here is definitely some skin hypersensitivity about the right upper extremity." Record at 561. He also noted the skin was not swollen. *Id.* He concluded that she was "developing some reflex sympathetic dystrophy as evidence[d] by the skin hypersensitivity" and referred her to Dr. Scot Hagadorn, a pain management specialist, "for consideration of a stellite [sic] ganglion injection," which is a treatment for RSD. *Id.*

Dr. Hagadorn examined Vance on March 14, 2011.  He noted that she was experiencing pain, stiffness, and hypersensitivity in her right arm.  On physical exam, he noted the following:

> The arm was very stiff.  It was difficult even to make a fist.  It was difficult even to let go from flexion to extension.  The skin appeared somewhat shiny, compared to the left side.  I could not appreciate any hair growth or maldistribution.  It was sensitive to touch with dysesthesias over most of the forearm down to the wrist.  The pulses were intact.  It felt somewhat cooler compared to the left side.

*Id.* at 559.  His diagnosis was "probable early complex regional pain syndrome."  He noted that he explained the risks of and alternatives to stellate ganglion blocks to Vance and that she wanted to proceed with the treatment.  Dr. Hagadorn performed a stellate ganglion block on March 21, 2011.  Two days later, Vance returned to Dr. Metzman, who noted that she was "getting a little better."  His diagnosis was "complex regional pain syndrome at the right arm." *Id.* at 557.

Vance returned to Dr. Hagadorn for a second stellate ganglion block on April 19, 2011. She reported that she had experienced a little relief for the first couple of weeks after the first treatment but then her symptoms had returned and even worsened.  Dr. Hagadorn reported that the skin on her right arm "look[ed] somewhat waxy."  When Vance did not report improvement after a third stellate ganglion block on April 27, 2011, Dr. Hagadorn referred Vance to Dr. Robert Bigler, another pain management specialist, for a second opinion, a course of action Dr. Metzman agreed with.  Dr. Bigler diagnosed Vance with peripheral neuropathy and RSD of the right upper limb.  He adjusted her medications and performed a series of three stellate ganglion block procedures.  Vance reported that the treatment did not provide significant relief of her symptoms.  Dr. Bigler recommended another treatment option (a stimulator), but she was unable to proceed with that option for financial reasons.

In July 2011, Dr. Bigler referred Vance for a pelvic x-ray because she had complained of right hip pain for two months. Mild arthritis was found in both hips. Dr. Bigler diagnosed her with localized osteoarthritis of the hip as well as RSD of the right arm.

Despite the fact that three treating physicians—an orthopedic surgeon and two pain specialists—diagnosed Vance with RSD of the right arm (or at least adopted that diagnosis), and the fact that she underwent extensive treatment for RSD, the ALJ credited the non-examining medical expert's testimony that she did not suffer from RSD. The problem is that the expert's testimony is not consistent with the record. Specifically, he testified as follows:

> See, the, the trouble is, [RSD] has very specific requirements. It requires temperature changes, growth and skin changes, and sometimes chronic swelling and things like that that are very, very specific. I don't see those changes documented in the file. And it is something that some of the pain physicians are very quick to go to and they do ganglion blocks and other types of procedures to try to address it. But, I actually don't see where, where it is that—an actual fair finding that would specifically support that. And to have it in an arm and a leg, it can occur on the same side in an arm and a leg, but it's usually . . . in a single extremity.

*Id.* at 81. In fact, the treating doctors did not suggest that Vance had RSD in her leg as well as her arm. Further, references to temperature changes, skin changes, and swelling—the "specific requirements" the medical expert said were absent—were, in fact, made by Vance's physicians. As noted above, Dr. Hagadorn noted that her "skin appeared somewhat shiny" and "somewhat cooler compared to the left side" on March 14, 2011, when he diagnosed her with probable early RSD. *Id.* at 559. On June 1, 2011, Dr. Metzman—the surgeon who first suspected RSD and noted that there was "definitely some skin hypersensitivity in March 2011—noted "a little swelling" in her hand. *Id.* at 630, 632. And in April, Dr. Hagadorn noted that the skin looked "somewhat waxy." *Id.* at 641. Perhaps in the medical expert's opinion these references are insufficient to support an RSD diagnosis, but the Court has no way of knowing that, because he

did not acknowledge their existence.  In fact, Social Security Ruling 03-2P, which specifically

addresses RSD, states that

> For purposes of Social Security disability evaluation, RSDS/CRPS can be established in the presence of persistent complaints of pain that are typically out of proportion to the severity of any documented precipitant and *one or more of the following clinically documented signs in the affected region at any time following the documented precipitant*:
>
> • Swelling;
>
> • Autonomic instability—seen as changes in skin color or texture, changes in sweating (decreased or excessive sweating), changes in skin temperature, and abnormal pilomotor erection (gooseflesh);
>
> • Abnormal hair or nail growth (growth can be either too slow or too fast);
>
> • Osteoporosis; or
>
> • Involuntary movements of the affected region of the initial injury.
>
> *When longitudinal treatment records document persistent limiting pain in an area where one or more of these abnormal signs has been documented at some point in time since the date of the precipitating injury, disability adjudicators can reliably determine that RSDS/CRPS is present and constitutes a medically determinable impairment. It may be noted in the treatment records that these signs are not present continuously, or the signs may be present at one examination and not appear at another. Transient findings are characteristic of RSDS/CRPS, and do not affect a finding that a medically determinable impairment is present.*

SSR 03-2p (emphasis added).  In light of the fact that the medical expert's rather conclusory

testimony regarding RSD fails to recognize the presence of the type of transient findings that

SSR 03-2p references,[1] and directly contradicts the opinions and treatments of Vance's three

treating physicians, it was error for the ALJ to rely on that testimony in determining that Vance

does not suffer from RSD.  On remand, the ALJ must consider all of the evidence of record in

---

[1]The Commissioner refers to these observations by Vance's doctors as "scattered complaints of some symptoms" but that is a mischaracterization; the doctors were not recording Vance's complaints of swelling, shiny skin, etc., but rather their own observations of those symptoms during the office visit in question.

light of the guidance found in SSR 03-2p and must not disregard the treating physicians'
diagnoses of RSD without pointing to substantial evidence of record that actually contradicts that
diagnosis.[2]

*The ALJ's Credibility Determination*

Vance argues that the ALJ failed properly to explain the basis for her finding that
Vance's testimony about her subjective complaints was not fully credible. The Court agrees.

"In determining credibility an ALJ must consider several factors, including the claimant's
daily activities, her level of pain or symptoms, aggravating factors, medication, treatment, and
limitations," *see* 20 C.F.R. ' 404.1529(c); S.S.R. 96-7p, and justify the finding with specific
reasons. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). "Furthermore, the ALJ may not
discredit a claimant's testimony about her pain and limitations solely because there is no
objective medical evidence supporting it." *Id.* (citations omitted).

In this case, after noting that she found Vance's "statements concerning the intensity,
persistence and limiting effects of [her] symptoms are not credible to the extent they are
inconsistent with the substantial evidence discussed throughout this decision forming the basis
for" the ALJ's residual functional capacity finding, the ALJ summarized Vance's medical
records and concluded that they demonstrated improvement in her symptoms after her surgeries:

> I have taken into account that the claimant had worsening right arm pain,
> radiating pain from right arm into the hand, stiffness, difficulty with flexion and
> extension, sensitivity to touch with dysesthesia over the forearm down the wrist
> during the March 14, 2011 exam, but these symptoms improved within one

---

[2]The Court notes one more problem with the ALJ's analysis of the RSD issue. The ALJ
stated that "the impartial medical expert who reviewed the entire medical record testified at the
hearing that he could not find any basis for the RSD assessment, especially considering that the
records only showed mild arthritis of both hips." Transcript at 17 (citing to report of July 2011
pelvic x-ray). That is nonsensical. A pelvic x-ray would not be used to diagnose RSD, so the
fact that the pelvic x-ray revealed only arthritis in the hips is irrelevant to the question of whether
Vance has RSD.

month. Specifically, the April 2011 exam notes showed little weakness on the right upper extremity and some hypersensitivity in the right arm, but her elbow motion was good on the exam. The May 2011 physical exam showed some hypersensitivity in the right arm, but she had good motion, intact intrinsic strength and sensation, and no swelling or redness. The June 2011 exam notes little swelling in the hands and slightly decreased sensation in all digits, but her elbow and hand motion was [sic] good, and intrinsic strength was intact during the physical exam. Despite the claimant's allegations that her pain radiates down the right leg, her upper and lower extremities strength and tone were normal. The November 2011 exam showed that she had increased sensation in the right arm and normal muscle strength in the extremities. The March 2012 extremities exam revealed that all major joints were intact, and the claimant had 5/5 strength in the upper and lower extremities. These findings support the claimant's functional capacity to perform light work with the identified restrictions.

Transcript at 19. This is essentially a recitation of the normal findings during those exams; it ignores entirely the fact that Vance consistently complained of (and was treated for) pain that her doctors attributed to RSD.[3] *See id.* at 553 (April 2011 exam; noting persistent skin hypersensitivity in right arm); *id.* at 634 (June 2011 exam; noting "Brenda says she is really not getting any better"); *id.* at 664 (March 2012 exam; noting pain rated 8/10 and that "[m]edications are becoming less effective). The ALJ does not explain how the normal findings are inconsistent with Vance's pain complaints; there is no evidence in the record that the type of pain about which Vance complains is always (or ever) accompanied by decreased strength and abnormal elbow and hand motion.

The ALJ's credibility explanation continues:

---

[3]The Commissioner suggests that the ALJ's failure to find RSD as a severe impairment was harmless error because the ALJ "considered the symptoms that Plaintiff suggests supported a diagnosis of RSD." Commissioner's Brief at 7. The fact is that the ALJ's failure to properly consider the diagnosis of RSD was not harmless; rather, it was key to the ALJ's credibility analysis, because it led to the ALJ to find that there was no basis for the type of pain experienced by Vance. In other words, the ALJ viewed the record as showing that Vance had carpal tunnel syndrome, had surgery that successfully treated that condition, and thereafter suffered only fairly minimal residual pain. If the ALJ had credited the RSD diagnosis, however, that diagnosis would have supported Vance's allegation that she suffers severe pain, because RSD is a condition manifested by "complaints of intense pain." SSR 03-2p.

Although I find the claimant credible as to the existence of her pain and severe impairments, I do not find credible her allegations regarding the severity and persistence of her symptoms and her allegations regarding the functional limitations they allegedly cause. I have considered the requirements of Social Security Ruling 96-7p in assessing the claimant's credibility. I note that the EMG findings, which provided the basis for surgery were not severe and the surgery showed good relief. The clinical exams after surgery reflect improvement, increased range of motion along with decreased hypersensitivity. As demonstrated in detail above, the overall records reflect that the claimant had a good recovery, and though still hindered by some functional limitations, would be capable of light work with additional limitations. While I acknowledge that the claimant had some hypersensitivity in the right upper extremity, and some complaints of pain, the clinical exams showed good elbow and hand motions, and good intrinsic strength.

*Id.* at 20. This is essentially a summary of the earlier paragraph. The ALJ then notes that "[i]n March 2012, the claimant informed the pain specialist that her pain medications and heating pad relieved her pain, which contradicts her testimony that nothing makes her pain better." *Id.* At the same exam referenced by the ALJ, however, the doctor noted that Vance's medication was becoming less effective; therefore her testimony several months later that nothing relieved her pain is not necessarily inconsistent. Next, the ALJ noted that Vance "testified that she is left handed and the medical records mostly showed problems with the right upper extremity." *Id.* The relevance of this fact to Vance's credibility is unclear. The ALJ then notes that Vance "testified that she started falling this past winter, but no emergency room visits are noted within the past year nor is there any other documentation of falls in the record." *Id.* This is a curious statement; certainly not all falls merit a trip to the emergency room or other medical treatment.

Finally, the ALJ notes that Vance "engages in a number of activities of daily living," including babysitting her young grandchildren, feeding herself, laundry, cleaning the bathroom, cooking, driving a car, shopping, paying bills, checking email, talking on the phone, visiting friends, cleaning, mopping, and making cookies. The ALJ opined that these "extensive activities do not support the claimant's allegations of pain due to her impairments." The Court disagrees

with the ALJ's characterization of Vance's level of activity as "extensive"; rather, these activities are similar to the type of limited activities the Seventh Circuit found "did not undermine or contradict [the claimant's] claim of disabling pain" in *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).

"[A]n ALJ must adequately explain his credibility finding by discussing specific reasons supported by the record." *Pepper v. Colvin*, 712 F.3d 351, 367 (7th Cir. 2013) (citing *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009)). The ALJ failed to do so in this case, citing only to the lack of objective evidence and "contradictions" that are not really contradictions. In making her credibility determination, the ALJ also failed to acknowledge the extensive, invasive treatment Vance has received and the array of pain medications she has been prescribed for her pain— treatment that is endorsed by three treating physicians, none of whom have suggested she is malingering or exaggerating her symptoms. Remand is necessary to address this error.

### The ALJ's Finding that Vance Can Handle and Finger Frequently

Vance's treating surgeon, Dr. Metzman, opined that Vance was limited to occasional handling and fingering. "Under 20 C.F.R. § 404.1527(c)(1), an ALJ should give more weight to the opinion of a source who has examined the claimant than to the opinion of a source who has not examined the claimant because of his greater familiarity with the claimant's conditions and circumstances." *Minnick v. Colvin*, ___ F.3d _____, 2015 WL 75273 (7th Cir. 2015). In addition,

> [a] treating physician's opinion regarding the nature and severity of a medical condition is entitled to controlling weight if supported by the medical findings and consistent with substantial evidence in the record. An ALJ may discount a treating physician's medical opinion if it is inconsistent with the opinion of a consulting physician, or when the treating physician's opinion is internally inconsistent, as long as he minimally articulates his reasons for crediting or rejecting evidence of disability.

*Skarbek v. Barnhart*, 390 F.3d 500, 503-04 (7th Cir. 2004) (citations omitted). In this case, the ALJ specifically stated that she gave "significant weight to [Dr. Metzman's] opinions because his findings are consistent with the records," Record at 20, and notes Dr. Metzman's opinion that Vance is limited to occasional handling and fingering. The ALJ then also expressly assigned "significant weight" to the opinion of the (non-examining) medical expert, who opined that Vance could frequently finger and grasp. The ALJ resolved this disagreement of opinion in favor of the medical expert, but failed to explain why she credited his opinion over that of the treating physician. This was error that must be corrected on remand. *See Minnick* (failure to explain reasons for not crediting treating physician's opinion that claimant could not bend or twist was error); *see also Roddy v. Astrue*, 705 F.3d 631, 637 (7th Cir. 2013) ("Even though the ALJ was not required to give [the treating physician's] opinion controlling weight, he was required to provide a sound explanation for his decision to reject it and instead to adopt [the examining consultant's] view.") (citation omitted). The ALJ also should explain on remand why she ignored Dr. Metzman's opinion that Vance's pain frequently interferes with her attention and concentration after determining that his findings were consistent with the medical evidence.

### Additional Arguments

The additional arguments raised by Vance relate to the ALJ's determination that she could perform some of her past relevant work. Any error with regard to this finding is harmless, however, because the ALJ made an alternative finding at step five that there were several other jobs Vance could perform.

## V.  <u>CONCLUSION</u>

For the reasons set forth above, the decision of the Commissioner is **REVERSED** and this case is **REMANDED** to the Commissioner for further proceedings consistent with the Court's Entry.

      SO ORDERED:  1/12/15

*William T Lawrence*

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic communication